Filed 1/22/21  V.T. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| V.T.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF RIVERSIDE COUNTY,<br><br>        Respondent;<br><br>RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>        Real Party in Interest. | E075910<br><br>(Super.Ct.No. RIJ900458)<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for extraordinary writ. Matthew C. Perantoni, Judge. Petition denied.

Anastasia M. Georggin for Petitioner.

No appearance for Respondent.

1

Gregory P. Priamos, County Counsel, and James E. Brown, Anna M. Marchand, and Julie Koons Jarvi for Real Party in Interest.

V.T. (mother) filed this petition for extraordinary writ after the juvenile court set a hearing to terminate her parental rights. V.T. and father, who is not a party to the writ, have one son, A.T., who was a one year old when the juvenile court took jurisdiction over him and removed him from his parents' custody based in part on the parents' issues with domestic violence. During the reunification period, mother was offered and participated in services for 14 months. At the 12-month review hearing (Welf. And Inst. Code, § 366.21, subd. (f)(1), unlabeled statutory citations refer to this code) the juvenile court followed the recommendations of the Riverside County Department of Public Social Services (the department) by terminating services and setting a permanency planning hearing under section 366.26.

Mother challenges the order, claiming there was insufficient evidence that she was provided reasonable services and that there was no substantial probability A.T. could be returned to her if she were provided six more months of services. We find there is substantial evidence on both points and deny the petition.

I

FACTS

A.     *Facts Leading to Detention*

The subject of this dependency proceeding is mother's two-year-old son A.T. In 2017, eight months before A.T. was born, mother began to participate in the Stepping

2

Stones program, which provided her with a parent partner. Mother remained a partner from 2017 onwards.

In November 2018, the department received a report alleging general neglect. After investigation, the department found A.T.'s basic needs were being met and there were no safety concerns, but they referred the parents to Home Visitation Module (SafeCare), in part because the family's home was unsanitary.

In May 2019, the department received a report alleging that mother and father engaged in domestic violence in front of A.T., and that the home was not safe or healthy for a child. Both parents accused the other of using drugs.

A social worker visited the home and found it unsanitary. The floor was littered with food, trash, and toys, and rotten food in the kitchen had caused a fruit fly infestation. Both parents denied engaging in domestic violence. Mother said she had been diagnosed with schizophrenia, major depression, and anxiety. Mother was on medication, but didn't take it consistently because of forgetfulness, and she was also involved in counseling and psychiatric services through Stepping Stones Mental Health Clinic. This was the same program that provided the parents with a parent partner, who was visiting the home every Thursday. Both parents were also still enrolled in SafeCare, and a SafeCare worker visited the home every Friday.

The department received another referral in mid-June. This referral alleged the parents were engaging in domestic violence in A.T.'s presence, and that mother had called police to report that father was stabbing the child. When the department responded,

they found father had not harmed A.T. Mother appeared unstable and couldn't focus or answer questions in complete sentences. The parents agreed to participate in family maintenance services.

The department conducted two home visits in early July. During the second visit the social worker noticed A.T. was bleeding from a diaper rash. She told the parents to take him to urgent care, but the parents were reluctant because father said the urgent care was closed and a cab would be expensive. The social worker called the nearest urgent care and confirmed it was still open. The social worker offered to drive A.T. and the parents. The parents declined the social worker's offer and said father would take A.T. himself. The parents did not answer calls the next day. The department conducted an unannounced home visit the day after that, and the parents admitted they never took A.T. to the doctor because it wasn't necessary.

Both parents continued to participate in the services provided by Stepping Stones, including working with a parent partner and peer support specialist. The peer support specialist said she was concerned the parents needed to work on healthy communication and coping skills. She said they tended to fall into a two- to three-week cycle where they would do well, then start an argument severe enough that father would threaten to leave, then reconcile after a couple days. She said she was concerned A.T. was "witnessing so much fighting."

On August 6, 2019, mother called her parent partner and claimed someone was trying to take A.T. from her. When the department called mother about this, she claimed

4

father was hurting himself. She said he had called her names, said she wasn't able to care for A.T., and had left with A.T. to go to Stepping Stones. She said she attempted to tackle him to prevent him from leaving. The department called father, who confirmed he and mother had fought, that he attempted to leave with A.T. to buy groceries, that mother tackled him while he was holding A.T., and that he went to Stepping Stones after that. Stepping Stones provided father and A.T. with temporary emergency housing.

The next day the department conducted a visit at the temporary housing. Father said mother needed to be admitted to emergency treatment services and that she had thrown her keys in the pool and told people she was homeless. Later that day, Stepping Stones informed the department that father told the person who drove him to the emergency housing that he and mother both used methamphetamine, that he "was letting [mother] use, so she could shut up," and that her latest outburst was in part because of withdrawals. The department returned to the emergency housing to place A.T. in protective custody. When they arrived, mother was also there.

Two days later, on August 9, 2019, the department filed a petition alleging A.T. fell under section 300, subdivision (b)(1), because both parents neglected him, suffered from unresolved mental health issues, abused substances, and failed to benefit from services. The juvenile court detained A.T. from mother and father on August 12, 2019.

B.    *Jurisdiction and Disposition*

On September 5, 2019, the court held a jurisdictional hearing and found the allegations against mother and father true. It ordered psychological evaluations for both parents to determine whether they would benefit from services.

During a supervised visit on October 28, 2019, the parents focused on the supervisor and foster parent rather than A.T., called A.T. a jerk, threatened to spank him while changing his diaper, and brought unhealthy snacks (donuts).

Mother's psychological evaluation took place in October. The evaluator recommended she continue receiving individual psychotherapy and dialectical behavior therapy "to address mood symptoms, persecutory ideation, difficulties associated with social avoidance and suicidal ideations, and to work through previous trauma." The evaluator also recommended mother participate in an intensive outpatient treatment program, attend parenting classes, and see a neurologist regarding her possible neurological impairments or traumatic brain injury.

On November 22, 2019, the court adjudged A.T. a dependent, removed him from his parents' custody, and ordered reunification services for both parents.

C.    *The Six-Month Review Period*

Leading up to the six-month review hearing, the parents continued to live together and denied any domestic violence. Mother complied with her mental health medication regimen. The department gave her referrals for general counseling, mental health medication evaluation, substance abuse treatment, substance abuse testing, psychological

evaluation, neurological evaluation, parenting education, and domestic violence education. Mother largely participated in these services and completed her parenting education. However, on February 18, 2020, she tested positive for methamphetamine. She was also unable to complete her neurological evaluation before May 2020, in part because of the COVID-19 pandemic.

On April 3, 2020, A.T. went to the doctor because he was coughing and wheezing.

At the May 14, 2020 six-month review hearing, the department recommended against returning A.T. because mother had not completed her services. The department also expressed concern about her positive drug test and unresolved mental health issues. In addition, they were concerned about the psychological evaluator's opinion that mother "had absolutely no insight into the nature of her mental disorder," "no insight into the nature of the difficulties between her and [father]," and "no insight in terms of her limitations towards caring for the children [sic] or being able to work out her issues with [father]." The evaluator stated mother was "unable to adequately benefit from services at this juncture due to her mental disorder and a lack of insight and acceptance of the nature of her mental disorder and need for treatment."

At the conclusion of the hearing, the court continued services for another six months.

D.    *The 12-Month Review Period*

Mother continued to participate in various services and remained medication compliant. However, she tested positive for methamphetamine again on May 6, 2020, and

7

did not appear for testing three times in May and June. She tested negative on June 29 and July 14, 2020.

In June and July 2020, A.T. visited the doctor multiple times due to concerns with his coughing, wheezing, and asthma, and he underwent an outpatient surgery.

Mother participated in FaceTime video calls with A.T. in May and June 2020. Though these visits were infrequent at first, they increased to calls about three times a week by the end of June. Both parents appeared for a socially distanced in-person play date with A.T. on July 10, 2020, with no reported concerns.

The department prepared another report prior to the 12-month status review hearing and continued to recommend against returning A.T. to his parents' care. The department noted mother was participating in services and showed some insight into her substance abuse issues and relationship with father. However, the department was concerned about mother's ability to maintain her sobriety and continued to be concerned about her failure to complete the neurological examination. They were also concerned that mother continued to have issues "managing her mental health symptoms and coping as evidenced by her inconsistent drug screens and positive results." Finally, the department pointed to mother's psychological evaluation indicating they had concerns regarding mother's ability to benefit from services. They ultimately recommended terminating services as to mother.

The court continued the 12-month status review hearing to September 3, 2020. Prior to this hearing the department prepared an addendum to their report. This addendum

changed the department's recommendation from terminating services to continuing them for another six months, as well as liberalized visitation. The report said mother completed her outpatient substance abuse program and continued to participate in other services, including individual and group counseling. She also continued to be treated for and remain medication compliant regarding her diagnosed schizoaffective disorder.

However, the de facto parents reported that neither parent seemed particularly concerned with protecting A.T. during in-person visits. For example, the parents allowed A.T. to climb on a play structure despite the structure being closed due to COVID-19. They also allowed the child to drink from a water fountain rather than the water bottle offered by the de facto parents. When asked whether they wanted to administer A.T.'s asthma treatment, they opted to watch a social worker do it instead. The parents never inquired about A.T.'s physical well-being despite a trip to the emergency room and three to four visits to urgent care for a recurring ear infection. The parents also did not make an affirmative effort to reach out regarding A.T.'s outpatient surgery, didn't ask questions when the de facto parent called to tell them how it went, and didn't "emote any concerns for the child."

On September 3, 2020, the court continued the 12-month status review hearing to October 7, 2020.

Prior to the continued 12-month status review, the department filed another addendum to their report. In this addendum the department changed their recommendation back to terminating services. The report again noted mother completed

9

her court-ordered services, had only four more sessions in her domestic violence program, continued to participate in group and individual counseling, and remained medication compliant. She also completed her neurological evaluation, which came back clear. Mother continued drug testing and tested clean on September 14, 2020.

The department expressed concerns regarding the parents' perceived passivity towards A.T. In particular, the department was concerned the parents had not changed their parenting style, as they started out "not involved in the child's wellbeing," as "evidenced by the parents not calling [A.T.] on his birthday, checking on [A.T.] before and after his surgery, asking in regards to [A.T.'s] diagnosis of asthma, and inquiring about [A.T.'s] speech therapy." When informed A.T. would be seeing a medical specialist, the parents didn't ask why he needed to be seen by a specialist. They also didn't seem to understand his medication regimen or ask any questions about it. Though mother attended A.T.'s speech therapy, she did not ask questions, and she seemed not to understand his treatment goals.

The department also expressed concern about visitation. They noted that "parents usually ask the social worker if they should change [A.T.'s] diaper, rather than using their own judgment." The department noted "the parents are diligent in following directives. However, they lack the desire to take initiative."

When pressed on their passivity, the parents said they didn't know and/or were intimidated by the foster family agency social worker and caregiver.

The 12-month review hearing took place on October 13, 2020. The social worker who took over the case in August 2020 testified. According to her, the issue was not the parents' compliance with services, but their communication. She attempted to fix this by giving them her phone number and emphasizing she was available any time. She said mother had completed her services, and she didn't think mother needed to be referred for any additional services. She also said that during one visit the parents let A.T. run into the road and did not try to stop him.

The court found the parents' progress toward alleviating or mitigating the issues necessitating placement was "minimal." It found the department had complied with the case plan and provided reasonable services. It found there was no substantial probability of return, terminated both parents' reunification services, and set a permanency planning hearing under section 366.26. The court found that "mother and father have certainly gone through the motions basically, physically completing services," but that "[i]t does not appear as though the parents are invested in the care of their medically-fragile child," and "[t]hey are certainly not taking any initiative."

Mother filed a timely notice of intent to file a writ petition.

II

DISCUSSION

Mother raises two issues in her writ. First, she claims the department failed to provide her with reasonable reunification services tailored to her needs as a special needs

mother. Second, she challenges the finding there was no substantial probability A.T. could safely return if she were given six more months of services.

A.    *Reasonable Reunification Services*

Mother argues the services provided were not reasonable in two main ways. First, that her original case plan didn't follow the recommendations of her psychological evaluation. Second, that she wasn't provided with services to help her manage A.T.'s medical conditions.

1.    Standard of Review

When a court orders reunification services, the department must ensure the services they provide are reasonable. (§ 361.5, subd. (a); *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501.) Whether the reunification services offered were reasonable and suitable is judged according to the circumstances of the particular case. (*Earl L. v. Superior Court*, at p. 1501.) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) Any reunification plan "must be specifically tailored to fit the circumstances of each family [citation], and must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding." (*In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777.)

We review the juvenile court's finding that reasonable services had been provided or offered for substantial evidence. (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598.) That is, we examine the record in the light most favorable to the juvenile

12

court's order, to determine whether there is substantial evidence from which a reasonable trier of fact could have made the finding under the clear and convincing evidence standard. (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483; *In re Isayah C.* (2004) 118 Cal.App.4th 684, 694.) We construe all reasonable inferences in favor of the juvenile court's decision. (*Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 70; *In re Julie M.* (1999) 69 Cal.App.4th 41, 46.) We also resolve conflicts in the evidence in favor of such a finding and do not reweigh the evidence. (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75.)

Mother emphasizes, however, the reasonable services finding "must be made by clear and convincing evidence in the trial court." (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238.) "In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) In other words, "the question before a court reviewing a finding that a fact has been proved by clear and convincing evidence is not whether the appellate court itself regards the evidence as clear and convincing; it is whether a reasonable trier of fact could have regarded the evidence as satisfying this standard of proof." (*Id.* at p. 1009.)

13

2.      The Case Plan

Mother has waived her right to argue her case plan was inadequate because she failed to timely seek appellate review of her case plan by appealing from the dispositional order. "By failing to appeal, [the mother] has waived any complaint she may have regarding the plan as ordered. [Citation.] Having declined to seek appellate review of the dispositional order, and having failed to file a petition to modify the dispositional order [citation], [the mother] cannot fault [the department] for complying with it." (*In re Julie M.*, *supra*, 69 Cal.App.4th at p. 47.)

But even if we consider the merits of mother's claim, we disagree with her that the initial case plan was inadequate. The allegations against her included that she neglected the health, safety, and well-being of her infant son by engaging in domestic violence around him, that she suffered from unresolved mental health issues which impacted her ability to care for him, that she had a history of substance abuse, and that she failed to benefit from pre-placement services. In response, her case plan called for general counseling, medication evaluations, a neurological evaluation, substance abuse counseling, substance abuse testing, and parenting education.

Contrary to mother's assertions, this plan is largely in line with her psychological evaluator's recommendations, which included counseling, a neurological assessment, medication management, and parenting education. While it is true the evaluator also recommended an intensive outpatient program focusing on coping and emotional regulation, reasonable services need not be perfect services. The test is whether they were

14

tailored to the identified needs of the parent, not whether they were the best possible services available. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972.)

### 3. Reasonableness of Services

In arguing the services the department provided weren't reasonable, mother focuses on the department's failure to provide assistance in learning about and managing A.T.'s medical care, as well as their failure to provide referrals for parenting classes particularly tailored to her special needs. She argues that, given her mental health issues, the department should have provided more specific parenting education courses "to address skills that would increase [her] awareness and insight about herself," and better help her understand A.T.'s medical needs. She also argues that it's not enough the social worker made herself available for questions, or might have helped if asked, because "[a] parent is 'not required to complain about the lack of reunification services as a prerequisite to the department fulfilling [their] statutory obligations.' " (*Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147, 1158.)

Mother relies on *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774 (*Elizabeth R.*) for the proposition that the reasonableness of services turns, in part, on whether they were *sufficiently tailored* to the special needs of a special needs parent. That case concerned an intelligent but mentally ill mother who suffered from severe bipolar disorder and postpartum psychosis. (*Id.* at pp. 1778-1779.) The mother was hospitalized and placed under conservatorship, circumstances authorities used to deny her visitation requests. The court found the services provided were not reasonable and not tailored to her needs

15

because authorities made no effort to allow her visitation despite her hospitalization, analogizing her circumstance to that of incarcerated parents. (*Id.* at pp. 1791-1793.)

This case is easily distinguishable from *Elizabeth R.* Perhaps most importantly, the mother in that case was effectively denied visitation because of her hospitalization for mental illness. The tailoring the court required in *Elizabeth R.* was that the relevant authorities allow visitation when parents are hospitalized for mental illness. (*Elizabeth R.*, *supra*, 35 Cal.App.4th at p. 1792.) Here, mother doesn't claim she was denied some essential component of her reunification services, only that the services provided were not uniquely well suited to her mental health issues.

While we do not doubt that more services, and possibly better-tailored services, might have helped mother here, the trial court's conclusion that the services provided were reasonable is supported by substantial evidence. The services provided—mental health counseling, substance abuse treatment, a domestic violence program, and parenting education, among others—directly addressed the reasons that led to A.T.'s removal and largely conformed to the recommendations in mother's psychological exams. Mother does not allege the department failed to provide referrals or otherwise failed to make these services available, nor does the record indicate a lack of contact between the department and mother. Indeed, the social worker who testified at the 12-month status review hearing made a point of trying to keep communication open between herself and mother, but found it was largely a one-way street.

The only category of service mother alleges should have been provided, and wasn't, is assistance in managing A.T.'s medical needs. We are sympathetic to the fact that these medical issues arose while he was outside her care, and that she therefore required instruction to understand and properly administer his medicine. But the department demonstrated what needed to be done, and mother never asked further questions or indicated she needed further instruction. The trial court could, therefore, reasonably conclude the department fulfilled their obligation on this front.

Mother argues her failure to ask questions or to fully comprehend her son's medical issues was a function of her mental illness, and that the department should have taken this into account and provided services that would help her in this regard. That is, while the instruction provided may have been reasonable for other parents, it was insufficient for her because of her mental health limitations. Specifically, mother argues her mental health issues made her reticent to ask questions and contributed to her misunderstanding of her child's medical condition.

However, on this record, there was substantial evidence for the juvenile court to conclude that mother's failure to ask questions was a sign of disinterest, not incapacity. Mother didn't just fail to ask questions about A.T.'s medicine, but also failed to ask about the child's numerous medical appointments (including at least one emergency room visit and an outpatient surgery), never inquired about what these treatments were for, didn't ask why A.T. needed to see a specialist, didn't ask and apparently didn't understand what medications he was on, and declined to ever administer the medications herself. While it

17

is plausible her mental health issues could have caused her to avoid asking questions or diminished her ability to express concern, it is also plausible that she just didn't appreciate the gravity of her son's medical issues or was disinterested in learning how to treat them. Indeed, our evidence of this isn't just limited to mother's failure to ask the right questions or express sufficient concern. Both the social worker and foster parents were generally apprehensive about how little mother looked out for A.T.'s physical safety in a variety of ways, including by letting him run into the street and drink from a public drinking fountain during a global pandemic despite the foster parents offering bottled water. Because it is reasonable to infer mother was simply unable or uninterested in learning about her son's medical issues, substantial evidence supports the juvenile court's conclusion that the services provided were reasonable.

Mother also argues the department should have offered her in-home care. However, these services are only available for family maintenance, not reunification. Indeed, mother participated in family maintenance services before removal and had some amount of in-home help in the form of a parent partner and SafeCare. Both of those programs had someone visit her home once a week, for a total of two days a week of in-home help. This did not help; mother was receiving these services during both domestic violence referrals which the department responded to and which led to removal. To the extent mother argues she needed more in-home care—such as in-home nursing care or 24/7 in-home help—it's not clear that such services were necessary or reasonable in this case. The record indicates that A.T.'s medication regime, while somewhat

complicated, was manageable, and his condition did not require around-the-clock medical care. Therefore the juvenile court could have concluded that the services actually provided—namely, instruction on how to administer and manage A.T.'s medication—were reasonable.

B.      *Substantial Probability of Return*

Lastly, Mother argues the juvenile court erred in terminating her services and setting a permanency planning hearing because there was a substantial probability A.T. would be returned if she were provided six more months of services.

Where, as here, the child is under the age of three at the time of removal, the statutory scheme of providing reunification services establishes "three distinct periods and three corresponding distinct escalating standards." (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 845.) In the first period—a phase from the jurisdictional hearing to the six-month review hearing where services are "presumed"—"services are afforded essentially as a matter of right." (*Ibid*.)  In the second period—a phase from the six-month review hearing to the 12-month review hearing where services are "possible"—"a heightened showing is required to continue services." (*Ibid*.; see § 366.21, subd. (e)(3) [requiring the court to continue the case to the 12-month hearing where "there is a substantial probability that the child . . . *may* be returned to his or her parent . . . within six months," italics added].)  And in the third period—a phase from the 12-month review hearing to the 18-month review hearing where services are "disfavored." (*Tonya M*., at p. 845.) Services can be continued only if there is a "substantial probability that the child

*will* be returned" within the extended time period (§ 366.21, subd. (g)(1), italics added), and "the juvenile court finds specifically that the parent has 'consistently and regularly contacted and visited with the child,' made 'significant progress' on the problems that led to removal, and 'demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs.' " (*Tonya M.*, at p. 845, quoting § 366.21, subd. (g)(1)(A)-(C); see *M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 178 ["the court can only continue the case to the 18-month review if it finds a substantial probability the child will be returned to the parent; moreover, the court must find all three of the listed factors to justify a finding of a substantial probability the child will be returned to his or her parent"].)

We review the juvenile court's finding there is no substantial probability of return and decision to terminate reunification services for substantial evidence. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688.)

Mother argues the court abused its discretion by refusing to continue the reunification period to the 18-month review period. She argues the decision was not supported by substantial evidence because she completed her case plan, made significant progress in addressing the issues which led to removal, and had the capacity and ability to provide for A.T.'s wellbeing.

As we've seen, the focus of the court's decision whether to award six more months of services is whether it is "substantially probable" the child will be able to safely

20

return home after the services. The court concluded the answer to that question was no. The court reasoned that although mother had "physically complet[ed] services that were required of" her, "[i]t does not appear as though [she is] invested in the care of [her] medically-fragile child." The court found she was "certainly not taking any initiative" to learn how to care for him, and, because of that, the court was concerned A.T. "would really have to fend for himself" if he were returned home.

On this record, we cannot say the juvenile court's decision was unreasonable. A.T. is not a typical two-year-old baby. He has elevated medical needs which require heightened attention and adherence to a strict medication regime. After 12 months of services, mother had not demonstrated that she could manage his special needs on her own. The primary evidence of this was her passivity. She did not ask questions regarding A.T.'s medication regimen or at doctor visits despite the social worker making it clear she was free to do so. She also did not demonstrate that she had a working knowledge of his medical condition and the necessary treatments for it, an obvious prerequisite to A.T.'s safe return home.

Mother argues the court's and department's concerns about her are misplaced. She suggests she was not disinterested in learning about A.T.'s condition but rather that it only seemed like she was. She implies it's not disinterest that caused her not to outwardly display concern, ask questions, or show initiative, but rather her mental health issues, which include social avoidance. This is supported by her contemporary complaints, recorded in the department's reports, that she was intimidated by the social worker and

21

foster family. It is entirely believable that mother is telling the truth, and that her mental health issues with social avoidance could have caused her to react to an inherently intimidating system by being intimidated into passivity. Her argument seems to be that if she were given six more months of services, she could work on this issue and successfully demonstrate her interest in learning about A.T.'s medical needs to the court.

Unfortunately for mother, the record supports a conclusion that six more months of services would not have such an effect. Over the course of these dependency proceedings, she has participated in 14 months of services and even showed some progress, but not in this area. For example, mother didn't test positive for drugs after May 6, 2020, she remained medication compliant, became more engaged with A.T. during visits, completed her case plan, was cooperative with the department, didn't have any additional law enforcement contacts, and appears not to have had any major mental health episodes after the incident which led to removal. However, where mother did not show progress was in demonstrating a concern for A.T.'s physical safety. She ignored A.T.'s bleeding diaper rash, allowed him to run into the street unimpeded, allowed him to drink from a public drinking fountain despite the risk of COVID-19, and let him play on a closed play structure. This, coupled with the psychological evaluator's opinion that she would be "unable to adequately benefit from services" lends reasonable support to the juvenile court's determination that six more months of services was not appropriate under section 366.21, subdivision (g).

We do not doubt that mother's mental health issues make it more difficult for her to manage her son's medical condition, interact with other caregivers, or express or experience the appropriate amount of concern for her son's medical issues. Nor do we doubt that she loves her son and wants to be reunified with him. Unfortunately, however, those facts are not dispositive to the specific question before the juvenile court—that is, whether it was substantially probable that after six more months of reunification services mother would be able to safely manage A.T.'s medical needs at home. This is a question that focuses on the risk of harm to the child, not on the parent's needs or affection for the child. On this record, we cannot say the court acted unreasonably in concluding six additional months of services would not result in a substantial probability that mother could safely manage A.T.'s medical needs at home.

## III

## DISPOSITION

We deny the writ petition.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH

J.

We concur:

McKINSTER

Acting P. J.

RAPHAEL

J.

23